**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GG Insurance Services Incorporated, | No. CV-23-01964-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Myles Johnson, et al., | |
| Defendants. | |

Defendant Myles Johnson believes he and plaintiff GG Insurance Services, Inc. ("GG") reached a settlement agreement long before GG filed this suit, so he filed a motion to enforce that alleged settlement agreement. GG believes defendants Johnson, John J. Kresevic, Turbo Insurance Group, LLC ("Turbo"), and the seven other related defendants (collectively, "defendants") erased a laptop that contained relevant evidence before this lawsuit began, so GG filed a motion for spoliation sanctions. The parties also filed a joint statement regarding discovery disputes.

Johnson's motion to enforce settlement agreement and GG's motion for spoliation sanctions are denied. As for the parties' discovery dispute, GG must provide definitive answers to some of defendants' interrogatories and requests for production ("RFPs").

**I.    Background**

In 2004, Dan Garzella launched an insurance agency. (Doc. 143-2 at 4.) In 2011, he hired Johnson, who was eventually promoted to vice president with an equity stake in GG. (Doc. 143-2 at 6.) In 2014, Garzella's company became GG, which is "an independent

1  insurance agency that facilitates the sale of personal and business insurance between
2  insurers and insureds." (Doc. 143-2 at 4.) Beginning in 2020, Garzella helped design
3  unique insurance software called Quote Monkey ("QM"), for which GG holds copyright
4  registrations. (Doc. 143-2 at 4–5.) Johnson allegedly "worked with and had intimate
5  knowledge of QM." (Doc. 143 at 4.)

6  Johnson has been friends with Kresevic since 2005. (Doc. 143-2 at 38) Kresevic was serving as CEO of the mortgage broker JFQ in 2019. (Doc. 143-2 at 6.) In the summer of 2019, GG and JFQ contemplated starting a joint venture but ultimately decided not to. (Doc. 143-2 at 6.) In 2020, Kresevic expressed interest in starting a company with Johnson. (Doc. 143-2 at 41.) Their efforts to form a company together appear to have become more serious in the spring and summer of 2021. In March 2021, "Johnson uploaded a folder to his Garzella Group OneDrive storage titled 'Quote Monkey' that contained the complete QuoteMonkey app and all associated files." (Doc. 143-3 at 104.) Between March 2020 and December 2021, Johnson uploaded "over 11,000 other files and folders to his Garzella Group OneDrive cloud storage," some of which contained information regarding "customers/clients" of GG. (Doc. 143-3 at 104.) And in July 2021, while Johnson was still at GG, he emailed himself a non-disclosure agreement he signed with Turbo. (Doc. 143-2 at 51–26.)

In August 2021, Kresevic sent Johnson a text stating he needed to get Johnson a laptop and telling him not to use his current GG laptop. (Doc. 143-2 at 45.) Kresevic made the laptop ready for Johnson shortly afterwards. (Doc. 143-2 at 46.)

In October 2021, Johnson and Kresevic were preparing an investor deck and Johnson asked if "[f]rom a legal standpoint" the deck would ever become public. (Doc. 143-2 at 47.) If not, he would "throw out [his] big boy accomplishments but wouldn't want to get sued saying [he was] using GG [intellectual property ('IP')] at Turbo." (Doc. 143-2 at 47.) Kresevic responded that the "[i]nvestor deck can get out[,] don't talk about that stuff . . . How you will use what you have done verbally not in writing." (Doc. 143-2 at 47.)

In the October investor presentation, Kresevic mentioned Turbo "want[ed] to take a lot of public data that is already readily available, build some proprietary technology that [Johnson] ha[d] already built at his own insurance agency, and take that and leverage it to make [an insurance] process a lot easier." (Doc. 143-3 at 19, 21.)

In December 2021, Johnson texted Kresevic about "getting legal representation in the event GG chose to sue me and Turbo." (Doc. 143-2 at 48.) Kresevic responded that GG "can't sue Turbo" but "it can sue [Johnson] – which if [Johnson has] been working with Jess [allegedly Johnson's legal counsel] and doing exactly what she says that's good." (Doc. 143-2 at 48.) Later that month, Johnson officially left GG and began working for Turbo. (Doc. 143 at 8.)

Around when Johnson left GG in December 2021, GG sent him a draft of a general release regarding the purchase back of his non-voting shares. (Doc. 152 at 3.) The release also contained an agreement by GG to waive the restrictive covenants in Johnson's employment agreement. (Doc. 152 at 3.) The parties exchanged multiple drafts and according to Johnson, that process culminated in he and GG entering into a binding settlement agreement in June 2022. (Doc. 152 at 7–8.) He brings a motion to enforce that agreement 32 months after it was allegedly reached and seventeen months after GG filed its complaint against him. (*See* Docs. 1 at 76, 152 at 7, 17.)

Johnson provides a detailed timeline of events related to the agreement that in his view would require the claims GG has asserted against him to be dismissed. (Doc. 152 at 2–9.) The relevant discussions began in October 2021 when Johnson notified Garzella that he intended to resign and work for Turbo. (Doc. 152-1 at 3.) In response, Garzella asked to discuss the potential of purchasing back the company shares Johnson owned. (Doc. 152-1 at 3.) Garzella also said he would waive the restrictive covenants in Johnson's employment agreement so Johnson could work for Turbo. (Doc. 152-1 at 4.) Johnson and GG then engaged in conversations that took place between December 30, 2021, and at least June 17, 2022, regarding the terms of an agreement that would result in GG buying back Johnson's shares, allowing him to work for Turbo, and releasing all claims GG could assert

against him. (Doc. 152 at 1–8.) During this time frame, the parties exchanged numerous draft agreements. (Doc. 152 at 1–8.) Up until June 15, 2022, material terms were still being discussed such as the payment structure for the buyback of Johnson's shares. (Doc. 152 at 7.) Significant changes were still being discussed on June 16 when Johnson's counsel pointed out the portion of the agreement discussing the release of claims against Johnson was ambiguous. (Doc. 152 at 7.)

On June 17, 2022, GG emailed Johnson's counsel a revised agreement with the changes Johnson's counsel had agreed to the day before and one additional modification. (Doc. 152 at 7.) In the email, GG's counsel asked Johnson's counsel to "either (i) let me know if this is good or (ii) your suggested modifications, if any." (Doc. 152-1 at 81.) A redlined Microsoft Word document of the agreement was attached. (Doc. 184-1 (non-electronic exhibit); *see also* Doc. 152-1 at 87–90 (the redlined Microsoft Word document).) Three days later, Johnson's counsel apparently accepted the redline, Johnson signed the agreement, and Johnson's lawyer sent it to GG's counsel indicating she "look[ed] forward to receiving the countersigned version." (Doc. 152-1 at 92–97.) Johnson acknowledges GG did not return a signed copy of the agreement and never paid Johnson for the repurchase of his stock pursuant to its terms. (Doc. 152 at 8 (citing Doc. 152-1 at 4).) But he maintains a valid agreement was formed and that GG's current claims against him are "for a litany of alleged violations of law that were released by the agreement." (Doc. 152 at 8 (citing Doc. 152-1 at 4).)

In February 2022, Johnson returned the temporary laptop Kresevic had given him. (Doc. 143-3 at 16.) In October 2022, Turbo's Information Technology department wiped the laptop to remove certain hardware restrictions and gave it to another Turbo employee. (Doc. 143-3 at 16.) Consistent with its usual practices, Turbo copied the laptop's contents to its One Drive account before wiping it. (Doc. 143-3 at 16.)

## II. Discussion

### A. Motion to Enforce Settlement Agreement

Johnson's motion to enforce settlement agreement requires the June 17, 2022, email

1  from GG transmitting a redlined version of the agreement be deemed a settlement offer.
2  But GG never made a settlement offer and Johnson's actions in the two-and-a-half years
3  after the purported settlement offer demonstrate he understood that.

### 1. Legal Standard

"A federal district court has inherent authority to enforce agreements that settle litigation before it." *Benge v. Ryan*, No. CV-14-00402-PHX-DGC-BSB, 2017 WL 588706, at *2 (D. Ariz. Feb. 14, 2017) (citing *In re City Equities Anaheim, Ltd.*, 22 F.3d 954, 957 (9th Cir. 1994)). A motion to enforce a settlement agreement is "essentially . . . an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989). "The movant has the burden of demonstrating that the parties formed a legally enforceable settlement agreement." *Benge*, 2017 WL 588706, at *2 (citing *In re Andreyev*, 313 B.R. 302, 305 (B.A.P. 9th Cir. 2004)). "For an enforceable contract to exist, there must be an offer, acceptance, and consideration." *Tabler v. Indus. Comm'n of Arizona*, 47 P.3d 1156, 1158 (Ariz. Ct. App. 2002)

### 2. Analysis

Johnson claims the email GG's counsel sent his lawyer on June 17, 2022, was a settlement offer. "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Yahweh v. City of Phoenix*, 400 P.3d 445, 447 (Ariz. Ct. App. 2017) (quoting Restatement (Second) of Contracts § 24 (1981)). "[W]hether an offer has been made does not depend on the offeree's understanding of the terms of the offer, but instead on whether a reasonable person would understand that an offer has been made and that, upon acceptance, the offeror would be bound." *Ballesteros v. Am. Standard Ins. Co. of Wis.*, 248 P.3d 193, 196 (Ariz. 2011) (collecting cases). Courts may rely on objective evidence to determine whether an offer was made. *See Schade v. Diethrich*, 760 P.2d 1050, 1058 (Ariz. 1988) (quoting Restatement § 33(3)) ("[T]he actions of the parties may show conclusively that they have intended to conclude a binding agreement.").

The email at issue here asked Johnson's counsel to "either (i) let me know if this is

good or (ii) your suggested modifications, if any." The email attached a redlined Microsoft Word document. (Doc. 152-1 at 81.) The court need not resolve whether this email on its own would be sufficient for a reasonable person to understand an offer was being made because taken together with the surrounding objective circumstances, no reasonable person would conclude an offer was made or accepted.

First, the fact that the version of the agreement GG sent over contained redlines cuts in favor of finding it did not constitute an offer. *See Schade*, 760 P.2d at 1058 (quoting Restatement § 33(3)) ("The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance."); *see also Day v. LSI Corp.*, 174 F. Supp. 3d 1130, 1154 (D. Ariz. 2016), *aff'd*, 705 F. App'x 539 (9th Cir. 2017) (same).

Separately, the parties' behavior after June 17 shows neither party believed they had reached an agreement. Parties' subsequent conduct is often relevant to determining whether a contract has been formed. *See Davsko v. Golden Harvest Prods., Inc.*, 965 F. Supp. 1467, 1472–73 (D. Kan. 1997) (quoting *King v. Wenger*, 549 P.2d 986, 989 (Kan. 1976)) (subsequent conduct "may be decisive of the question of whether a contract has been made"); *Koleinimport "Rotterdam" N. V. v. Foreston Coal Exp. Corp.*, 283 F. Supp. 184, 186 (S.D.N.Y. 1968) (citing *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261, 264 (2d Cir. 1965); 1 Corbin, Contracts §§ 95, 101 (1963)) (the parties' subsequent communications are relevant to the question of whether a contract has been formed).

GG focuses on three aspects of the parties' subsequent behavior as establishing no agreement was reached: (1) negotiations were still ongoing five months later, including discussions regarding the possibility of a mediation (Doc. 175 at 6–7); (2) Johnson did not demand the money the alleged agreement required GG to pay for his company stock until he filed counterclaims against GG, 938 days after the agreement was supposedly reached (Doc. 120 at 65); and (3) Johnson first moved to enforce the purported settlement agreement two-and-a-half years after it was allegedly reached, only after this lawsuit was filed. (Doc. 120 at 66–68.) Johnson does not explain why he waited so long to try and

enforce the purported agreement and no reasonable person would fail to demand the $111,302.57 payout the agreement required or litigate for more than two years before filing a motion if he believed a binding settlement had been reached.

Additionally, it is undisputed GG never signed the purported agreement. (Doc. 180 at 5.) This factor is not dispositive because a valid contract can be found even without one party's signature. *See Muchesko v. Muchesko*, 955 P.2d 21, 24 (Ariz. Ct. App. 1997). But "the failure of one party to execute an instrument usually renders it incomplete[.]" *Id.* A contract may still be found, however, "where all the parties, including the non-signers, by their actions recognize the validity of the agreement and acquiesce in its performance[.]" *Id.* (quoting *Modular Sys., Inc. v. Naisbitt*, 562 P.2d 1080, 1083 (Ariz. Ct. App. 1977). As previously stated, that is not the case here. Negotiations between the parties continued for five months after the purported agreement was reached, Johnson never sought the payment the agreement would have required, and Johnson did not seek to enforce the agreement for over two-and-a-half years after it was allegedly reached.

Johnson also argues the language in the June 17 agreement allowed for a contract to be formed without GG's signature. (Doc. 180 5–6.) But the language he cites *does* require GG's signature for an agreement to be formed. It states the agreement "may be executed in one or more counterparts . . . and shall become effective when one or more counterparts have been signed by *each* of the parties hereto." (Doc. 152-1 at 97 (emphasis added).) Johnson claims this shows the contract "does not *require* signature, but rather *permits* signature in multiple counterparts." (Doc. 180 at 5.) But a plain reading of the language makes clear GG is still required to sign the contract, it may just do so in "one or more counterparts." (Doc. 152-1 at 97.) For this additional reason, a valid contract was not formed between the parties on June 17.

Johnson cites a District of Utah case which he claims found a valid offer under similar circumstances. But in that case, the plaintiff sent an email containing a settlement agreement "and asked for either redlines or a return of signed documents," noting it "would 'handle the filing'" if the defendant returned signed documents without modification. *Hope*

*Int'l Hospice Inc. v. Net Health Sys., Inc.*, No. 2:22-CV-00656-DBB, 2023 WL 5508840, at *5 (D. Utah Aug. 25, 2023) (footnote omitted). That clear offering language is different from that in GG's June 17 email. GG's question whether the agreement was "good" did not invite acceptance by returning a signed document and instead indicated negotiations were ongoing. Nor was there evidence in *Hope* that the parties proceeded for years through litigation before the defendant attempted to enforce the agreement. (Doc. 152-1 at 81.)

It is Johnson's burden to show a legally enforceable settlement agreement was reached, *Benge*, 2017 WL 588706, at *2, and he has not met that burden. Johnson's motion to enforce settlement agreement is denied.

## B. Motion for Spoliation Sanctions

GG seeks spoliation sanctions based on defendants wiping Johnson's laptop before this case began. Defendants did not have a duty to preserve evidence when they wiped Johnson's laptop, so there can be no related sanctions.

### 1. Legal Standard

Before issuing sanctions under Fed. R. Civ. P. 37(e), a court must determine whether "(1) the [electronically stored information ('ESI')] should have been preserved in the anticipation or conduct of litigation; (2) the ESI is lost because a party failed to take reasonable steps to preserve it; and (3) the ESI cannot be restored or replaced through additional discovery." *Burris v. JPMorgan Chase & Co.*, 566 F. Supp. 3d 995, 1011 (D. Ariz. 2021), *aff'd*, No. 21-16852, 2024 WL 1672263 (9th Cir. Apr. 18, 2024) (citation and quotation marks omitted). The duty to preserve "arises when litigation is reasonably foreseeable and the party knows or should know ESI may be relevant to pending or future litigation." *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 337 (D. Ariz. 2022). If the court finds a party "acted with the intent to deprive another party of the information's use in the litigation," it may issue sanctions. Fed. R. Civ. P. 37(e)(2).

### 2. Analysis

GG alleges Johnson and Kresevic intentionally wiped Johnson's laptop to delete evidence that could be used against them in this lawsuit. (Doc. 143 at 10–11.) GG moves

for an adverse inference instruction and default judgment sanctions on GG's copyright claim. (Doc. 143 at 3.) It is undisputed Johnson's laptop was wiped in October 2022. But defendants argue they did not have a duty to preserve the laptop when it was wiped. (Doc. 161 at 5–10.) If they are correct, the court may not issue spoliation sanctions against them. *See Burris*, 566 F. Supp. 3d at 1011.

GG puts forth four pieces of evidence it claims show defendants reasonably anticipated litigation before the laptop was wiped: (1) Johnson told Kresevic before the investor presentation in October 2021 that he "wouldn't want to get sued [by GG] saying I'm using GG IP at Turbo[;]" (2) Kresevic told Johnson he needed to get him a laptop and that he should not use his GG laptop; (3) Kresevic told Johnson to discuss the technology—allegedly similar to QM—he planned to develop at Turbo "verbally" at the investor presentation, "not in writing;" and (4) Johnson mentioned getting legal representation to Kresevic "in the event GG chose to sue me and Turbo." (Doc. 166 at 1–2.)

The duty to preserve evidence "begins when litigation is pending or reasonably foreseeable." *Milke v. City of Phoenix*, 497 F. Supp. 3d 442, 464 (D. Ariz. 2020), *aff'd*, No. 20-17210, 2022 WL 259937 (9th Cir. Jan. 27, 2022) (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)). Whether litigation is "reasonably foreseeable" is a "flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Id.* (quoting *Micron Tech., Inc.*, 645 F.3d at 1320).

That GG indisputably did not ask defendants to preserve evidence until it sent them a litigation hold on January 4, 2023 (Doc. 161-1 at 6–10)—after defendants had wiped the laptop—tilts in favor of not imposing spoliation sanctions.[1] *See Prewitt v. United States*, No. 10 C 102, 2012 WL 5381281, at *5 (N.D. Ill. Oct. 31, 2012) ("Courts have held that no duty to preserve evidence inheres to a defendant if the plaintiff does not specifically ask the defendant to preserve the evidence before it is destroyed in the ordinary course of

---

[1] As does the fact that a backup of the laptop appears to have been produced in discovery—meaning GG suffered no prejudice by the laptop's deletion, *see Fast*, 340 F.R.D. at 341—despite GG's unsupported contention the backup is not an "adequate forensic substitute for analyzing" the laptop "in its pre-wiped state." (Doc. 166 at 11.)

business."); *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) ("courts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, litigation was imminent" and defendants "had no reason to suspect litigation until—at the earliest—[plaintiff's] attorney sent [defendant] a demand letter"). Given the four pieces of evidence GG has presented, there is no question Johnson thought litigation against him was *possible*, but that does not demonstrate a duty to preserve. Recognizing a *possibility* of litigation is not the same as recognizing a reasonably foreseeable *likelihood* of litigation. *See Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 526 (N.D. Cal. 2009) (finding defendants' statements about a possible threat of copyright action insufficient to trigger a duty to preserve evidence because "[a] general concern over litigation does not trigger a duty to preserve evidence.") A party does not have a duty to preserve relevant documents or evidence until a potential claim is identified or they know future litigation is probable rather than possible. *Id.* GG's evidence here amounts only to Johnson acknowledging litigation against him was possible, which is insufficient to give defendants a duty to preserve evidence before they wiped Johnson's old laptop.

GG cites a case saying evidence must be preserved "[a]s soon as a potential claim is identified[.]" *Apple Inc. v. Samsung Electronics Co., Ltd.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. Aug. 21, 2012). But a potential claim was not identified against Johnson at the time his old laptop was wiped in the same way potential claims were identified against Samsung in *Apple*. There, Apple "confronted Samsung with 'a comprehensive summary of its specific patent infringement claims against specific Samsung products'" in a presentation. *Id.* at 990. The presentation's identification of "specific Apple intellectual property and specific Samsung devices" that infringed on Apple's IP qualified as a "potential claim" that imputed to Samsung a duty to preserve. *Id.* at 991. Here, Johnson merely worried IP litigation against him was *possible*; GG had not indicated it intended to sue Johnson or Turbo for specific IP-related reasons like Apple did. Nor did Johnson articulate what sort of IP suit he thought might be leveled against him or Turbo and on

what basis such a claim would arise. *Apple* is inapposite.

In its reply, GG presents a new argument based on newly-submitted evidence: a privilege log claiming work product privilege over a November 29, 2021 text exchange (before Johnson's old laptop was wiped). This claim of work product privilege is relevant, GG argues (Doc. 166 at 5), because claiming a communication is protected by the work product doctrine necessarily implies that communication is "tied to [an] adversarial process." *In re Grand Jury*, 23 F.4th 1088, 1093 (9th Cir. 2021). So, GG argues, the privilege log means Johnson was discussing litigation with his attorney fourteen months before his laptop was wiped (Doc. 166 at 5). Defendants move to strike the new exhibit or for leave to file a sur-reply to address the new issues and evidence. *Briggs v. Montgomery*, No. CV-18-02684-PHX-EJM, 2019 WL 13039282, at *2 (D. Ariz. Mar. 19, 2019) (recognizing "a reply brief that introduces new issues or new evidence . . . may justify allowing a sur-reply to address the new issues or evidence").

Striking the exhibit or allowing a sur-reply is unnecessary here, however, because defendants have persuasively argued the new evidence is irrelevant to the resolution of the motion for sanctions. Specifically, defendants argue they erred while preparing the privilege log and now claim the communications were subject to the attorney-client privilege but not the work product protection. In support, defendants waived attorney-client privilege and produced some of the communications. (Doc. 190-1 at 1.) Having reviewed the unredacted communications, they do not discuss impending litigation, and therefore did not create a duty for defendants to preserve evidence. (Doc. 190-1 at 1.)

Because defendants did not have a duty to preserve evidence before they wiped Johnson's old laptop, they cannot be sanctioned for spoliation of that evidence. Because the exhibit defendants want stricken does not change the court's analysis, their motion to strike is denied as moot.

### III. Discovery Disputes

The parties have also filed a joint statement regarding four discovery disputes. This is yet another of many tiresome discovery disputes filed so far in this case. The parties are reminded to meet and confer to attempt to cooperatively resolve all discovery disputes. There are other cases on the court's docket and it is ill-advised for any party to use the court as a discovery babysitter, as both parties have repeatedly done here.

#### A. *In Camera* Review of Attorney-Client Privileged Messages

GG discovered defendants improperly withheld several text messages on the basis of the work product doctrine. (Doc. 189 at 2.) Defendants said they erroneously marked some messages as work product that were actually attorney-client privileged. (Doc. 189 at 2.) GG is concerned defendants are "retroactively changing these designations" after GG points out the designation is inconsistent with defendants' position on other matters. (Doc. 189 at 2.)

Defendants recently re-designated fifteen text messages as attorney-client privileged. (Doc. 189 at 2.) They then retracted all privilege designations for eight of those text messages. (Doc. 189 at 2.) GG has reason to doubt these messages are privileged because no attorney appears on any of them, and one of these fifteen re-designated text messages that it saw did not, in GG's view, meet the attorney-client privilege criteria. (Doc. 189 at 2.) GG asks the court to conduct an *in camera* review of the remaining re-designated text messages to determine if they are attorney-client privileged. (*See* Doc. 189 at 2–3.)

The Supreme Court has "le[ft] the decision of whether to conduct an *in camera* review within 'the sound discretion of the district court.'" *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1096 (9th Cir. 2007) (quoting *United States v. Zolin*, 491 U.S. 554, 572 (1989)), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). *In camera* review should be exercised judiciously. *Id.* And "the party seeking in camera review must make an initial showing of 'a factual basis adequate to support a good faith belief by a reasonable person' that the materials at issue are being improperly withheld as privileged." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab.*

*Litig.*, No. 22-MD-03047-YGR (PHK), 2025 WL 782733, at *2 (N.D. Cal. Mar. 12, 2025) (quoting *Zolin*, 491 U.S. at 572).

GG has not met its burden of providing "a good faith belief . . . that the materials at issue are being improperly withheld as privileged." *Id.* Its only factual basis for this claim is that GG redesignated work product protected materials as attorney-client privileged and that it believes one of those text messages was not protected by the attorney-client privilege. (Doc. 189 at 2–3.) Mere suspicion that material may not be privileged is insufficient to warrant *in camera* review. *See Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 353 (9th Cir. 2014) ("[Plaintiff's] belief that the documents are not privileged appears to be based on little more than unfounded suspicion, and the district court correctly concluded that [plaintiff] had not made the requisite factual showing to justify an *in camera* review.") (citation omitted). Accordingly, GG's request for *in camera* review is denied.

### B. Review of Documents Marked Attorneys' Eyes Only

Defendants requested software development emails between GG and the company that helped it develop QM—"the software that is the central subject of this [intellectual property]/trade secret litigation"—which GG marked as "Confidential – For Counsel Only." (Doc. 189 at 4–5.) Defendants claim a "blanket" attorneys' eyes only ("AEO") designation of 52,000 consecutive pages of documents falls far short of th[e] good faith standard" required by this court's protective order. (Doc. 189 at 7; *see also* Doc. 52 at 2–3 ("Any party may designate information as 'CONFIDENTIAL' only if, in the good faith belief of such party and its Counsel, the unrestricted disclosure of such information could be harmful to the business or operations of such party.").)

GG has established a "good faith belief" that "the unrestricted disclosure" of its emails with the company that helped it develop QM would "be harmful to [its] business." (*See* Doc. 52 at 3.) The emails designated AEO "describe QM's development process, contain code, and discuss competitive secrets. Disclosure of these materials to Turbo would result in severe competitive harm to GG (especially handing this information over to Turbo,

a direct competitor)." (Doc. 189 at 4.) GG also correctly points out that the protective order in this case still allows defendants to give all of these materials to defendants' retained computer code expert. (Doc. 189 at 4.) Turbo's attempt to de-designate these materials as AEO so it can give them to its in-house software developer—who GG claims "created Turbo's in-house code that is derivative and infringing on QM"—further supports GG's argument that de-designating the disputed materials could cause it severe harm. (Doc. 189 at 4.) GG has adequately put forth a good faith basis for its AEO designation, so defendants' request that those materials be de-designated is denied.

### C. Request to Supplement Damages Calculation

Defendants seek supplemental discovery responses to eight interrogatories related to GG's damages. (Doc. 189 at 5.) In many of these interrogatories, GG claims "[d]iscovery is still ongoing, and [it] reserves the right to supplement this response." (*See e.g.*, Doc. 189-1 at 6, 10, 11, 12.) Defendants claim these responses are "improper . . . and should [be] supplemented so that, at a minimum, Defendants are provided with the amount of [GG's] alleged damages." (Doc. 189 at 5.)

A party is required to provide other parties with "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(ii). GG claims it did so by disclosing in September 2024 through an expert report that it had "$5,000,000+ in damages." (Doc. 189 at 3.) GG also claims it "is diligently calculating damages based on information it recently received . . . and [it] will supplement when its calculations are complete." (Doc. 189 at 4.) That is not how the discovery process works, as evidenced by Rule 26. GG must now provide a concrete answer to defendants' interrogatories. It may later supplement that answer if it wishes to do so.

Defendants also request a supplemental response "to Defendant Johnson's Interrogatories 7 and 13" "because [GG] has not provided a substantive response" to them. (Doc. 189 at 6.) GG does not argue it has provided a substantive response to these interrogatories, so, to the extent it has not, it is ordered to do so.

### D. Request to Supplement RFPs

Defendants seek supplemental responses to eight of its RFPs, seven of which "seek documents supporting the damages alleged in paragraphs of [GG's] Second Amended Complaint." (Doc. 189 at 6.) Similar to its responses to the disputed interrogatories, GG's RFP responses state it "is presently analyzing appropriate methodologies for calculating these damages, and that methodology may impact what documents are responsive to this request." (*See e.g.*, Doc. 189-1 at 34, 35, 36, 41.) Defendants argue these responses are insufficient and that GG must state whether they have any responsive documents other than those previously produced. (Doc. 189 at 6.)

A response to RFPs "must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request, including the reasons." Fed. R. Civ. P. 34(b)(2)(B). Defendants acknowledge GG could validly respond that it "presently has no documents responsive to these requests[.]" (Doc. 189 at 6.) But defendants want to require GG to state as much if that is the case, "with the understanding that [it] can supplement its response in accordance with [Rule] 26." (Doc. 189 at 6.) GG is ordered to provide a definitive statement regarding the documents defendants asked for in the disputed RFPs or provide the documents those RFPs seek.

### IV. Conclusion

Johnson's motion to enforce settlement agreement is denied because GG never made him a settlement offer. GG's motion for spoliation sanctions is denied because defendants did not have a duty to preserve evidence before they wiped Johnson's laptop. Defendants' motion to strike is denied as moot because considering the exhibit at issue did not change the outcome of the motion for spoliation sanctions. As to the parties' discovery dispute, GG is ordered to provide definitive answers to some of defendants' interrogatories and RFPs.

/

/

/

Accordingly.

**IT IS ORDERED** Johnson's motion to enforce settlement agreement (Doc. 152) is **DENIED**.

**IT IS ORDERED** GG's motion for spoliation sanctions (Doc. 143) is **DENIED**.

**IT IS ORDERED** defendants motion to strike (Doc. 171) is **DENIED** as moot.

**IT IS ORDERED** the parties shall comply with the discovery rulings set forth above.

Dated this 4th day of June, 2025.

Honorable Krissa M. Lanham
United States District Judge