**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GG Insurance Services Incorporated,<br><br>        Plaintiff,<br><br>v.<br><br>Myles Johnson, Unknown Johnson, John J Kresevic, Christina Kresevic, Turbo Insurance Group LLC, Turbo Insurance Group LLC, Brian Hickey, Zach Miller, and Turbo Insurance Services Holdings LLC,<br><br>        Defendants. | No. CV-23-01964-PHX-KML<br><br>**ORDER** |

Plaintiff GG Insurance Services, Inc. ("GG") alleges former employee Myles Johnson stole its intellectual property, confidential information, customers, and employees when he left GG to work with John Kresevic at Turbo, a competing company. GG alleges Johnson's actions breached state and federal law as well as numerous contracts. GG filed this suit against Johnson, Kresevic, Turbo, and other former GG employees who left to work for Turbo. Some defendants filed counterclaims and most have moved for summary judgment, as has GG.[1] The motions are granted in part and denied in part.

### I.    Factual Background

In December 2003, Dan Garzella launched an independent insurance agency that was later re-named "GG Insurance Co." in 2014. (Doc. 225-1 at 5.) GG, based in Scottsdale, sells insurance products from multiple insurers and prioritizes homeowners

---

[1] Much of the summary judgment briefing was filed under seal. This order uses information filed on the public docket and cites sealed material only in a limited manner such that it may remain public.

insurance. (Doc. 225-1 at 5.) GG uses information obtained from contracted mortgage lenders and brokers to obtain home insurance quotes which are then factored into borrowers' mortgage applications. (Doc. 225-1 at 15-16.) At the same time, GG's technology—including a computer program it developed called "Quote Monkey" ("QM")—"rapidly offer[s] prospective homebuyers competitive insurance quotes" from its partner insurers. (Doc. 225-1 at 16.)

GG hired Myles Johnson in 2011 and promoted him to Vice President in approximately 2018. (Doc. 225-1 at 6.) In that capacity, Johnson ran GG's personal-lines operations (which included homeowners insurance). (Doc. 225-1 at 6.) Around the time he was promoted, Johnson signed agreements for stock options and an equity stake in the company, including the "MJ Option Agreement" that contained certain restrictive covenants. (Doc. 225-1 at 6, 83.) Between 2019 and 2021, Johnson was involved in "crucial development discussions for QM" and highly-sensitive work regarding the development of GG's trade secret processes. (Doc. 225-1 at 7-8.) Johnson had consistent access to QM materials and at one point in March 2021, downloaded QM files to a separate cloud location—even though QM could not be run from that location. (Doc. 231-1 at 73-74.)

John Kresevic, an old personal friend of Johnson, worked at a mortgage company and in 2019 unsuccessfully offered to buy GG. (Doc. 245-2 at 148-50.) In 2021, he and Johnson agreed to operate Turbo, an existing insurance startup that was not functionally operating until the two became involved. (Doc. 245-6 at 44-48.) Johnson started at Turbo in July 2021 but continued working at GG without disclosing that role. (Doc. 245-3 at 12-18, 50; *see* Doc. 245-9 at 85.) From July until November 2021, Johnson and Kresevic planned to bring GG employees to Turbo (Docs. 245-3 at 10; 245-10 at 55); told Turbo investors Johnson had already built certain technology at GG that Turbo would "leverage" to make its development process easier (Doc. 245-3 at 53); and shared processes and accomplishments Johnson had developed at GG with Turbo investors (Doc. 245-3 at 23). Johnson was involved in developing software at Turbo that filled the same role QM did for GG. (Docs. 225-4 at 11-12; 225-6 at 36.) GG alleges Turbo's software was developed using

confidential, trade secret, and copyrighted GG materials. (*See* Doc. 244.)

Johnson left GG in mid-November 2021 and became Turbo's president on December 18, 2021. (Doc. 245-3 at 72; *see* Doc. 245-9 at 85.) The next month, Turbo began operating as an independent insurance agency which, like GG, directly sells personal-lines insurance including homeowners insurance. (Doc. 225-4 at 9-10.)

In January 2022, Johnson hired four former GG employees to work at Turbo (Doc. 225-6 at 26), including as sales leads (Doc. 225-2 at 25). Each briefly worked for other employers between their employment at GG and Turbo, but GG alleges they had collectively planned to leave GG for Turbo on Johnson's solicitation. (Doc. 245 at 8-9.) Johnson also allegedly "directly solicited at least three of GG's insurer customers" to "establish carrier appointments with Turbo." (Doc. 225 at 10.) These insurers (Travelers, Safeco, and Nationwide) confirmed with Garzella the solicitation occurred and was successful; each formed a relationship with Turbo within six weeks after Johnson left GG. (Doc. 225-1 at 11.) In an email to Turbo investors, Kresevic credited Johnson's "previous relationship with these agencies" as the reason he was able to land the carrier appointments so quickly. (Doc. 225 at 10; *see* Doc. 225-6.) Similarly, GG alleges many of Turbo's mortgage referral partners worked with GG before switching to Turbo. (Doc. 225 at 12; *see* Doc. 225-6 at 45.)

GG also alleges Turbo hired a third-party marketing company, MyBizNiche, to execute a "competitor campaign" against GG. (Doc. 225 at 11.) A MyBizNiche employee testified Johnson "specifically asked for marketing that would result in Turbo's webpage being placed above GG's webpage whenever a Google search was run for 'Garzella Group.'" (Doc. 225-4 at 42.) Johnson denies he made this request and Turbo argues the employee does not have sufficient personal knowledge of the events. (Doc. 241 at 6-7.)

After Johnson left GG, he and Garzella discussed terms for a buyout of Johnson's GG shares and a waiver of terms in Johnson's contract which would otherwise prevent him from working for Turbo. (Doc. 175-1 at 66.) These discussions continued throughout 2022 and involved counsel for both parties but did not result in a signed contract. (*See* Doc.

175-1 at 58-64.) GG's position is there were no agreed-upon settlement terms (Doc. 225 at 14-15), while Turbo alleges the parties agreed to terms and intended to be bound by a June 17, 2022 version of a settlement agreement (Doc. 241 at 17-18). In August 2022, GG discovered Turbo had solicited GG's customers and taken "one of GG's largest referral partners." (Doc. 225 at 14 (citing Doc. 175-1 at 66).) The buyout conversations then resulted in unsuccessful mediation and settlement negotiations. (Doc. 175-1 at 71, 83.)

In 2023, GG filed this suit against Turbo, Johnson, Kresevic, and former-GG employees (including Brian Hickey and Zach Miller) who also left GG for Turbo. The operative complaint alleges thirty-one claims against various combinations of defendants. The claims against two of the former-GG employees (Easley, Bobadilla) and one entity (JFQ Lending) were dismissed via stipulations, as were certain claims against some remaining defendants. (Docs. 211; 218-19.) The following claims remain, with original numbering retained.

1. Copyright Infringement (Direct Copying): Johnson, Kresevic, and Turbo;

2. Copyright Infringement (Intermediate Copying): Johnson, Kresevic, and Turbo;

4. Misappropriation of Trade Secrets in violation of the federal Defend Trade Secrets Act ("DTSA"): Johnson, Kresevic, and Turbo;

5. Misappropriation of Trade Secrets in violation of the Arizona Uniform Trade Secrets Act ("AUTSA"): Johnson and Turbo;

6. Unfair Competition: Johnson, Kresevic, Miller, Hickey, and Turbo;

7. Breach of Officer Fiduciary Duty: Johnson;

8. Aiding and Abetting Breach of Officer Fiduciary Duty: Kresevic and Turbo;

9. Breach of Employee Fiduciary Duty: Johnson;

10. Aiding and Abetting Breach of Employee Fiduciary Duty: Kresevic and Turbo;

11. Breach of Contract (MJ Agreement): Johnson;

12. Breach of Implied Covenant of Good Faith and Fair Dealing (MJ

- 4 -

Agreement): Johnson;

13. Aiding and Abetting Breach of the Implied Covenant of Good Faith and Fair Dealing (MJ Agreement): Turbo;[2]

14. Breach of Contract (MJ Option Agreement): Johnson;

15. Breach of the Implied Covenant of Good Faith and Fair Dealing (MJ Option Agreement): Johnson;

16.  Aiding and Abetting Breach of the Implied Covenant of Good Faith and Fair Dealing (MJ Option Agreement): Turbo;

19. Breach of Contract (BH Agreement): Hickey;

20. Breach of the Implied Covenant of Good Faith and Fair Dealing (BH Agreement): Hickey;

25. Tortious Interference with Contracts/Business Expectancies: all remaining defendants;

28. Conversion: Johnson and Turbo;

29. Civil Conspiracy: Johnson, Turbo, Kresevic, Hickey, and Miller;

30. Unjust Enrichment: Johnson, Turbo, and Kresevic;

31. Declaratory Judgment: all remaining defendants.

In their joint answer, defendants Johnson and Turbo asserted counterclaims against GG for breach of contract and breach of the implied covenant of good faith and fair dealing.

Not long before summary judgment motions were due, Kresevic obtained separate counsel, leading to the filing of three separate motions. GG seeks partial summary judgment on Claim 14 and all counterclaims; defendants Turbo, Hickey, and Miller filed for summary judgment on Claims 1, 2, 4, 5, 13, 16, 19, 20, and 25; and Kresevic seeks summary judgment on Claims 1, 2, 4, 5,[3] 6, 8, 10, 13, 16, 25, 29, and 30.

---

[2] Claims 13 and 16 were also brought against Kresevic but GG "abandons" those claims "as to Kresevic only." (Doc. 245 at 9.)

[3] Kresevic moves for summary judgment on this claim (misappropriation of trade secrets in violation of the AUTSA) (Doc. 231 at 4), but it is not asserted against him so the court will not consider his arguments. (Doc. 115 at 38.)

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Id*. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III.   Analysis

Because the summary judgment motions significantly overlap, the parties' arguments are analyzed by claim instead of by motion.

### A. Copyright Infringement (Claims 1 and 2)

In Claims 1 and 2, GG alleges copyright infringement against Johnson, Kresevic, and Turbo. Turbo and Kresevic separately move for summary judgment on these claims, while Johnson "joins in the analysis and arguments" made by Turbo but does not move for summary judgment himself. (Doc. 237 at 2.) It is not clear what Johnson means by that, so the court will not address the copyright claims against Johnson. Both Turbo and Kresevic argue there is no evidence any defendant copied files from GG's servers and any similarities between QM and Turbo's product are not protected by copyright. (Docs. 254 at 8; 231 at 2.)

To establish copyright infringement, a plaintiff must demonstrate "(1) ownership of

a valid copyright, and (2) copying of constituent elements of the work that are original" beyond the scope of any license. *Great Minds v. Off. Depot, Inc.*, 945 F.3d 1106, 1110 (9th Cir. 2019) (simplified). "Copying can be prove[n] by evidence indicating that the infringer had access to the copyrighted work and that the protected portions of the works are substantially similar." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 636-37 (9th Cir. 2008); *see Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (copying may be shown "circumstantially"). It is uncontested that GG held a valid copyright for each relevant version of QM, so the parties' only disputes involve the "copying" prong. (*See* Doc. 245 at 21.)

Two types of copying are relevant to GG's claims. First, making "literal copies" of copyrighted work beyond the scope of a relevant license constitutes direct copyright infringement. *See Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 837 (Fed. Cir. 1992). Second, "intermediate copying" occurs when an infringer uses a copy as "an initial step in the development of a competing copy," regardless of whether the end product infringes the copyright. *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1518-19 (9th Cir. 1992).

### 1. Infringement by Turbo

GG alleges Turbo both directly and intermediately copied QM code. (Doc. 244 at 16). To support its direct-copying allegation, GG points to Johnson's undisputed downloading of QM and associated files to his GG cloud account in March 2021 and his alleged copying of QM to a laptop Turbo later wiped. (Doc. 244 at 14-15; *see* Doc. 231-1 at 74.) The parties' summary judgment filings focus on intermediate copying.

Under its intermediate copying theory, GG alleges Johnson made an unauthorized copy of QM to understand QM code, then used it to create the Turbo product. (Doc. 244 at 15-16.) There is no evidence Turbo (as opposed to Johnson) directly copied QM; the Turbo product does not contain duplicate QM code (Doc. 231-1 at 48), and no testimony or reports show Turbo employees used or manipulated QM code. *Cf. Sega*, 977 F.2d at 1518 (finding intermediate copying where defendant disassembled and modified copyrighted code). But

GG presents evidence that with the files Johnson downloaded, he could have manipulated QM source code or given it to a programmer to reference when building the Turbo product (Doc. 235-2 at 9). *See Sony Computer Ent., Inc. v. Connectix Corp*., 203 F.3d 596, 600 (9th Cir. 2000) (intermediate copying where competing company copied and reverse-engineered code). GG points to enough similarities between the products to create a dispute of fact whether copying occurred. (Docs. 244 at 17; 245 at 23.)

Copying may be proven with circumstantial evidence where the infringer had access to copyrighted work[4] and the works are substantially similar. *See Jada Toys,* 518 F.3d at 636-37. The Ninth Circuit determines substantial similarity using a two-part test: an extrinsic prong evaluates the similarity of ideas and expression using objective criteria like expert testimony, and an intrinsic prong tests the similarity of expression using the perspective of an "ordinary reasonable observer." *Id*. at 637; *see Apple Computer, Inc. v. Microsoft Corp*., 35 F.3d 1435, 1442 (9th Cir. 1994). This analysis considers only elements that are protectable by copyright. *Apple Computer*, 35 F.3d at 1443-44; *see Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002). A method of expressing an idea may be protected, but ideas, processes, and elements common to similar products are not copyrightable. *Atari Games,* 975 F.2d at 845; *see also Skidmore*, 952 F.3d at 1069. Granting summary judgment on substantial-similarity issues is disfavored. *See Narell v. Freeman*, 872 F.2d 907, 909 (9th Cir. 1989).

Turbo and Kresevic argue the only similarities between the products are not protected by copyright. For example, in their view, that QM and the Turbo product share similar functions—obtaining insurance leads and processing quotes—cannot factor into the substantial-similarity analysis. (Docs. 231 at 3-4; 235 at 3-5.) But GG presents evidence more similarities exist: for instance, that the Turbo product contains more similar features to QM than other products in the industry which perform the same function, and was built

---

[4] The parties do not contest that Johnson had access to QM through his employment at GG (Doc. 244 at 14) and had access to the Turbo product's development, but dispute his level of involvement in developing the Turbo product. (*Compare* Doc. 254 at 8 (Turbo argues third-party developer "had minimal, to no, interactions with Myles Johnson" during software creation) *with* Doc. 235-2 at 80 (evidence Johnson was heavily involved with development)).

with a very similar "architecture" to QM's despite many other possible architectures. (Doc. 235-2 at 26, 35-37.) Copyright protection may extend to a combination of unprotected elements if that combination is sufficiently original. *See Merch. Transaction Sys., Inc. v. Nelcela, Inc.*, No. CV-02-1954-PHX-MHM, 2009 WL 723001, at *8 (D. Ariz. Mar. 18, 2009). Meanwhile, there is also a dispute of material fact regarding whether these similar features are "industry-standard" and therefore unprotectable; Turbo provides shareholder testimony that QM's functions are common in the industry, but GG's expert found no competitor besides Turbo uses elements so similar to QM (Docs. 231-1 at 100; 235-2 at 35-37). *See Cavalier*, 297 F.3d at 823, 828. GG has raised issues of fact as to the similarity between protectable elements that are material to the extrinsic prong.

Next, the intrinsic prong asks whether "the total concept and feel of the works" would be considered substantially similar using the perspective of an ordinary reasonable observer without expert assistance. *Narell*, 872 F.2d at 913; *see Sedlik v. Von Drachenberg*, 163 F.4th 667, 674 (9th Cir. 2026). Courts typically do not grant summary judgment based on the intrinsic prong. *Shaw v. Lindheim*, 919 F.2d 1353, 1359 (9th Cir. 1990), *overruled on other grounds by Skidmore*, 952 F.3d at 1051 ("To conclude otherwise would allow a court to base a grant of summary judgment on a purely subjective determination of similarity."). There is no reason to deviate from that practice based on GG's evidence here. *See Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 873 F. Supp. 2d 1192, 1219-20 (N.D. Cal. 2012) (denying summary judgment where circumstantial evidence showed (1) the former employee's computer contained the plaintiff company's code and (2) the new employer's product was developed at an "unusually fast pace"). Turbo's motion for summary judgment on the copyright infringement claims is denied.[5]

---

[5] Turbo raises merger and *scénes à faire* doctrines, arguing any similar expressions are a result of there being very few ways to express the ideas behind QM. (Doc. 235 at 4). *Merch.*, 2009 WL 723001, at *11. These affirmative defenses may be raised for the first time at summary judgment so long as there is no showing of prejudice. *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). But GG has claimed prejudice (Doc. 244 at 17), and regardless, the same finding that the products share similarities beyond their function would preclude summary judgment based on these doctrines. (*See* Doc. 235-2 at 88-90, 153 (evidence Turbo's product is more similar in functionality and architecture than other competitors' software)).

**2. Copyright Infringement against Kresevic**

GG alleges Kresevic is liable for contributory direct and intermediate infringement. (Doc. 231 at 4.) Contributory infringement requires the defendant know of infringing activity and intentionally induce or materially contribute to it. *Fonovisa, Inc. v. Cherry Auction, Inc*., 76 F.3d 259, 264 (9th Cir. 1996). Kresevic argues even if copying occurred, there is no evidence he knew about it or contributed to it. (Doc. 231 at 4.)

Material factual disputes as to Kresevic's knowledge and actions preclude summary judgment here, too. For instance, Kresevic knew Johnson had been "building this exactly [sic] platform for the past 7 years and built the majority of this tech . . . already," and that Johnson had access to QM while in talks to start Turbo. (Doc. 245-3 at 53.) He also told investors Turbo would be "tak[ing]" proprietary technology Johnson had built at GG. (Doc. 245-3 at 53.) Viewing this evidence in the light most favorable to GG, a reasonable jury could conclude Kresevic had a contributory role in Johnson's copying. Kresevic's motion for summary judgment on the copyright infringement claims is denied.

**B. Trade Secrets Misappropriation (Claims 4, 5)**

Turbo and Kresevic move for summary judgment on GG's trade secret claims. GG claims defendants misappropriated elements of QM which constitute trade secrets, including its multi-part workflow for obtaining insurance leads and generating quotes, how it integrates with mortgage closing timelines, its internal lead assignment processes, and how data is compiled and sent. (Doc. 247 at 5-6.)

GG brings federal and state claims for misappropriating trade secrets. The federal law, the DTSA, requires allegations the plaintiff (1) owns a trade secret, (2) which the defendant misappropriated, (3) which caused damage to the plaintiff. *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 7000071, at *2 (D. Ariz. Sept. 18, 2020). Meanwhile, Arizona's AUTSA does not require a damages allegation; a plaintiff need only allege "the defendant misappropriated a trade secret through improper means." *HTS Inc. v. Boley*, 954 F. Supp. 2d 927, 943 (D. Ariz. 2013). Complaints commonly plead claims under both statutes, *see, e.g., Gordon Grado M.D., Inc. v. Phoenix Cancer & Blood Disorder*

*Treatment Inst. PLLC*, 603 F. Supp. 3d 799, 809-12 (D. Ariz. 2022); *ReBath*, 2020 WL 7000071, at \*2-3, and the elements of the two "are substantially similar" such that arguments under both statutes can be analyzed together, *Early Warning Servs., LLC v. Brandon O'Loughlin, P.A.Z.E. LLC*, No. 24-7315, 2025 WL 1895313, at \*1 n.1 (9th Cir. July 9, 2025).

Defendants' summary judgment motions argue GG did not sufficiently identify a trade secret (Docs. 231 at 5; 235 at 7); GG waived trade secret claims by allowing public access to QM (Docs. 231 at 5; 235 at 9-12); GG showed no evidence Kresevic misappropriated trade secrets (Doc. 231 at 10); and GG has not shown Kresevic caused damages (Doc. 231 at 12-13).

Under both the DTSA and AUTSA, a plaintiff must show trade secrets exist and identify them. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). A plaintiff "need not spell out the details of the trade secret," but must describe its subject matter with "sufficient particularity to separate it from matters of general knowledge in the trade" and "to permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 881-82 (N.D. Cal. 2018) (simplified); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020). If adequately identified, determining whether information constitutes a trade secret is typically a fact issue not appropriate for summary judgment. *W.L. Gore & Assocs., Inc. v. GI Dynamics, Inc.*, 872 F.Supp.2d 883, 889 (D. Ariz. 2012); *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003) ("[T]he question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side.").

The AUTSA preempts non-AUTSA civil remedies for trade secret misappropriation to the extent those claims are based on trade secrets. A.R.S. § 44-407(A); *see Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 550 (Ariz. 2014). This determination is not typically made at summary judgment, because although claims may eventually be found to rest exclusively on trade secret materials such that they are preempted, the

factfinder must decide whether information is a trade secret first. *See Universal Engraving, Inc. v. Metal Magic, Inc*., 602 F. App'x 367, 369 (9th Cir. 2015) (AUTSA displaces only claims regarding confidential information falling under AUTSA's "trade secret" definition). Kresevic argues unfair competition and other tort claims are preempted by the AUTSA (*see* Doc. 231 at 15), but this determination must wait until the jury makes a finding regarding what materials are trade secrets. *Id*.

Turbo alleges QM's functions, processes, and data points are too broad to be considered trade secrets compared to, for instance, source code. (Doc. 235 at 7-8 (citing *Agency Solutions.Com, LLC v. TriZetto Grp., Inc*., 819 F. Supp.2d 1001, 1017 (E.D. Cal. 2011)).) But GG's list—which includes, among other things, specific methods of data collection, database structures, and process particulars like data and lead organization and automatic updates (Docs. 244 at 6-8; 247-2 at 9-29)—is far more specific than those in other cases. *Cf. Digital Mentor, Inc. v. Ovivo USA, LLC*, No. C17-1935-RAJ, 2018 WL 6724765, at *8 (W.D. Wash. Dec. 21, 2018) (dismissing claim which described trade secrets broadly, for example as a "data collection system" and "novel design"). More importantly, GG describes features of QM which are not "evident in the operation of the software," for instance, a specific system for assigning leads to users (Doc. 247-2 at 23-25). *Agency Solutions.Com*, 819 F. Supp. at 1001. Although Turbo offers shareholder testimony suggesting QM's features are common within the insurance industry, GG's expert found no other competitor uses processes with as many of QM's features and architecture. (Docs. 231-1 at 100; 235-2 at 35-37.) GG has identified its trade secrets with sufficient particularity to permit the defendants to ascertain their boundaries and "separate [them] from matters of general knowledge in the trade." *Alta Devices*, 343 F. Supp. 3d at 881-82.

Turbo and Kresevic also argue GG waived its trade secrets protection when its outside IT developer placed these secrets at a particular URL that could have been accessed by anyone who knew the address. (Doc. 235 at 11-12.) That is not enough to waive trade secrets protection on summary judgment. The URL was only accidentally left active, was

not associated with GG's website or known to the public, could not be password-protected without compromising QM's functionality, and could not be guessed by uninvolved parties. (Doc. 243-7 at 96-101). *Cf. Arkeyo, LLC v. Cummins Allison Corp.*, 342 F. Supp. 3d 622, 626 (E.D. Pa. 2017). Nor did GG waive trade secret protection by describing those alleged secrets in court filings. *Mission Wellness Pharmacy LLC v. Caremark LLC*, 641 F. Supp. 3d 673, 681 n.2 (D. Ariz. 2022) ("information does not lose its protected trade-secret status simply because it is listed in court documents"). A rational jury could find GG took reasonable measures to keep QM information secret. *InteliClear*, 978 F.3d at 661 (whether a trade secret is "readily ascertainable" to others is typically a question of fact for a jury).

Kresevic also argues there is no evidence he personally misappropriated the trade secrets or caused GG damages. But like for copyright infringement, the parties offer conflicting facts regarding Turbo's copying of code and processes, Johnson's and Kresevic's access to GG materials, and their statements suggesting intent to misappropriate. (*See* Doc. 245-3 at 53.) And a jury could find trade secret elements—for instance, QM's architecture—"recognizably show up in" the Turbo product's programming. *Agency Solutions.Com*, 819 F. Supp. 2d at 1030 (holding similar evidence of use constitutes proof of misappropriation).

Finally, fact issues exist as to GG's calculation of damages. *See Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054 (D. Ariz. 2010) (plaintiffs alleging misappropriation of trade secrets must show proximately-caused damages). Though Kresevic argues otherwise, GG provides both an overall calculation of damages caused by the misappropriation and (as explained above) a detailed description of Kresevic's alleged role in that misappropriation. (*See* Docs. 245-9 at 39-40, 44; 245-9 at 58.) At this stage, GG need only present evidence Kresevic's behavior was a substantial factor in the harm and is reasonably connected to GG's damages. *Id*. It has.

Turbo's and Kresevic's motions for summary judgment on the trade secrets claims are denied.

### C. Validity of Contracts at Issue (Claims 13, 16, 19, 20, 25)

Turbo moves for partial summary judgment for all claims relying on the restrictive covenants in contracts between GG and Johnson and Hickey (the MJ and BH Agreements) and an agreement between GG and Johnson under which Johnson purchased stock options (the MJ Option Agreement). (Doc. 235 at 13.) Claims 13, 16, 19, 20, and 25 allege breaches of contract, breaches of those contracts' implied covenants, and tortious interference with contracts and business expectancies, all related to those agreements. According to Turbo, the restrictive covenants in the contracts "are, as a matter of law, overbroad and unenforceable." (Doc. 237 at 13.) Conversely, GG seeks summary judgment that Johnson breached the MJ Option Agreement. The court will only consider arguments regarding the MJ Agreement and MJ Option Agreement because GG makes clear its claims based on the BH Agreement relate only to its confidentiality provisions, not its restrictive covenants.[6] (Doc. 244 at 17-18.) And especially given the agreements' severability clauses (*see* Doc. 235-2 at 214), those confidentiality provisions would not be affected if the restrictive covenants were unenforceable. *See Mousa v. Saba*, 218 P.3d 1038, 1044 (Ariz. Ct. App. 2009).

The restrictive covenants in the MJ Agreement required Johnson agree not to "solicit, divert, take away or attempt to take away, or accept business from any customer or prospective customer" for which he had been responsible at GG, and not to solicit GG employees to a competing business. (Doc. 235-2 at 170.) These restrictions operated in Maricopa County for six months after Johnson's employment at GG unless he was terminated for cause, which would extend the time period to one year. (Doc. 235-2 at 170-71.) The MJ Option Agreement further extended that timeline if Johnson chose to purchase GG stock by including agreements that for three years post-employment, Johnson would

---

[6] Kresevic also fleetingly argues the confidentiality provisions in all the employment agreements are unenforceable because they do not explicitly exclude topics which federal law permits employees to disclose regardless of contractual confidentiality restrictions, thereby forcing employees to agree to unlawful restrictions. (Doc. 231 at 19.) But "[i]t has long been the rule in Arizona that a valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract." *Banner Health v. Med. Sav. Ins. Co.*, 163 P.3d 1096, 1100 (Ariz. Ct. App. 2007). The federal carve-outs are implicitly incorporated and do not make the restrictive covenants unenforceable.

not work or contribute to a competitor; solicit GG employees; or solicit current, former, or prospective GG customers to offer similar or competitive services. (Doc. 235-2 at 215.) That agreement applied Arizona-wide. (Doc. 235-2 at 215.) All the agreements included a severability provision. (Doc. 235-2 at 215.)

A restrictive covenant's reasonableness is a question of law. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1280-81 (Ariz. 1999). Courts weigh the totality of the circumstances in determining reasonableness, holding a restriction unreasonable when "the restraint is greater than necessary to protect the employer's legitimate interest" or when "that interest is outweighed by the hardship to the employee and the likely injury to the public." *Id*. at 1283. This inquiry is fact-intensive. *Id*. at 1281. Employers' legitimate interests include retaining their customer bases, protecting referral sources, and generally preventing the use "of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment." *Id.* at 1284. The party seeking to enforce the agreement bears the burden of showing the restraint is no greater than necessary to protect its legitimate interest. *Id*. at 1286.

The level of scrutiny afforded to a restrictive covenant depends on the type of agreement in which it is found. *Gann v. Morris*, 596 P.2d 43, 44 (Ariz. Ct. App. 1979). Employer-employee restrictive covenants are strictly construed against the employer, but those connected to the sale of a business are evaluated more leniently because of the need to transfer goodwill. *Farber*, 982 P.2d at 1281-82. Here, the MJ Agreement is an employer-employee agreement that will be strictly construed against GG. The MJ Option Agreement is more complicated because Johnson bargained for stock options—company ownership— in exchange for the explicit consideration of heightened restrictions. (Doc. 235-2 at 175.) Johnson also worked at a high enough level within GG such that the stock options could plausibly be construed as consideration for a sale of goodwill and a guarantee Johnson would not compete with GG. *See id*. at 1282. Ultimately, though, the level of scrutiny applicable to the MJ Option Agreement does not change the outcome because GG has not met its burden to show the entirety of the three-year duration was necessary to protect its

- 15 -

legitimate interests, whether as a business-seller or an employer.

### 1. MJ Agreement

Turbo argues Section 4 of the MJ Agreement is unenforceable. (Doc. 254 at 19-20.) The crucial restrictive covenants state that for six (or twelve, if terminated for cause) months after the end of his employment at GG, Johnson:

> shall not, directly or indirectly: (a) solicit, divert, take away or attempt to take away, or accept business from any customer or prospective customer Employee solicited or serviced, or for which Employee had direct responsibility at any time during the twelve (12) months preceding Employee's termination and located within Maricopa County; or (b) hire, solicit or induce for any Competing Business the employment or retention of any person who is now or hereafter employed by Employer within Maricopa County.

(Doc. 235-2 at 170.)

A restrictive covenant's reasonableness is analyzed according to the covenant's "duration, its geographic scope, and the range of employee's activities affected," taken together as a whole. *Unisource Worldwide, Inc. v. Swope*, 964 F. Supp. 2d 1050, 1064 (D. Ariz. 2013). When the covenant's purpose is to protect customer relationships, as is true here (Doc. 244 at 20), the duration of the restriction is reasonable only if it lasts no longer than necessary to hire a replacement and afford him the opportunity to demonstrate effectiveness to customers. *Amex Distrib. Co. v. Mascari*, 724 P.2d 596, 604 (Ariz. Ct. App. 1986). Similarly, it must not prevent former employees from conducting business in locations other than the employer's primary business, *Olliver/Pilcher Ins., Inc. v. Daniels*, 715 P.2d 1218, 1220 (Ariz. 1986), or restrain employee activities broader than the "particular specialty of the present employment," *Unisource Worldwide*, 964 F. Supp. 2d at 1064. But given limits "as to time and space, the covenant is ordinarily valid unless it is to refrain from all business whatsoever." *Gann*, 596 P.2d at 44.

The MJ Agreement prohibited post-employment solicitation of customers and employees within Maricopa County. (*See* Doc. 235-2 at 169-170.) Courts are significantly more likely to find reasonable covenants like this that do not entirely prevent competition.

- 16 -

*Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 725 (Ariz. 2006). The restrictions are also limited to GG's primary business locations, given that GG retains "a significant focus on the entire Arizona mortgage market" but remains a national insurer (Doc. 244 at 20). *See Olliver/Pilcher Ins.*, 715 P.2d at 1220. Accordingly, the geographic scope of the restriction is reasonably limited to one county, as compared to a restriction for any county in which the employee dealt with customers. *See Unisource Worldwide*, 964 F. Supp. at 1066; *cf. Berkadia Real Est. Advisors*, 2022 WL 18495279, at *15 (national restriction too broad where employee worked primarily in Tucson). The six-month timeline is also reasonable given Johnson's high-level experience and the complex servicing relationship at issue. *Amex*, 724 P.2d at 604 ("If the selling or servicing relationship is relatively complex . . . Courts seldom criticize restraints of six months or a year.").

However, other terms place unreasonably broad restrictions on Johnson's scope of business. GG prohibited Johnson from soliciting *or accepting* current *or prospective* GG customers. (Doc. 235-2 at 170.) This language unreasonably restricted Johnson from accepting customers he did not solicit, particularly those whom Johnson may not have known were GG's prospective customers. *See Unisource Worldwide*, 964 F. Supp. 2d at 1064; *see also USI Ins. Servs. LLC v. Alliant Ins. Servs. Inc.*, No. CV-23-00192-PHX-SMB, 2023 WL 3792749, at *9 (D. Ariz. June 2, 2023) (restriction unenforceable in part because non-servicing clause extended to "active prospective clients").

But some overly-broad language does not render the entire restrictive covenant unenforceable because the agreement contained a severance clause allowing for a limited remedy. If a contract was intended to be severable, as is the case here (Doc. 235-2 at 172), "the court can enforce the lawful part and ignore the unlawful part" of a restrictive covenant in a process known as "blue penciling." *Olliver/Pilcher Ins*, 715 P.2d at 1221; *see Farber*, 982 P.2d at 1286 (courts may eliminate "grammatically severable, unreasonable provisions" but may not rewrite the contract). The court strikes "or accept business from" and "prospective" from these provisions. The restrictive covenants as blue-penciled read:

> Employee shall not, directly or indirectly: (a) solicit, divert, take away or

attempt to take away any customer Employee solicited or serviced, or for which Employee had direct responsibility at any time during the twelve (12) months preceding Employee's termination and located within Maricopa County; or (b) hire, solicit or induce for any Competing Business the employment or retention of any person who is now or hereafter employed by Employer within Maricopa County.

Turbo also argues the word "customer" as used in GG's contracts is overbroad because its insurer partners contract with many agencies, not exclusively GG. (Doc. 235 at 21-23.) A restrictive covenant may be broader than necessary to protect an employer's legitimate interest where, because of non-exclusivity, the customer can contract with multiple businesses at the same time. *See Garcia v. Off. Keepers LLC*, No. CV-17-03032-PHX-DGC, 2018 WL 1046783, at *3-4 (D. Ariz. Feb. 26, 2018). But here, despite non-exclusivity, GG shows the insurers' use of a competing agency does have a negative impact on the interests it seeks to protect via the restrictive covenants. *Cf. id*. For instance, GG receives commissions from those insurers, and could lose some of those commissions if competitors who know GG's offerings could immediately make the same or better offering. (Doc. 244 at 21-22.) Accordingly, the contract's definition of "customer" permissibly includes the insurer customers without being overly broad or restrictive.

For these reasons, the MJ Agreement as modified is not unenforceable and Turbo's motion for summary judgment on all claims relying on the employment agreements is denied.

### 2. MJ Option Agreement

Turbo argues Section 15 of the MJ Option Agreement is unenforceable. (Doc. 235 at 16.) That provision required Johnson not to:

(a) Contribute his . . . knowledge, directly or indirectly, in whole or part, as an employee, officer, owner, manager, advisor, consultant, agent, partner, director, shareholder . . . or in any other similar capacity to an entity engaged in the same or similar business as the Company and its Affiliated, including those engaged in the business of personal insurance services, risk management and consulting and/or life and financial services, in the State of Arizona for a period of three (3) years following the Optionholder's

termination of continuous service;

(b) Directly or indirectly, solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company or its Affiliates in the State of Arizona for three (3) years following the Optionholder's termination of continuous service; and/or

(c) Directly or indirectly, solicit, contact (including, but not limited to, e-mail, regular mail, express mail, telephone, fax, and instant message), attempt to contact or meet with the current, former or prospective customers of the Company or any of its Affiliates for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company or any of its Affiliates in the State of Arizona for a period of three (3) years following the Optionholder's termination of continuous service.

(Doc. 235-2 at 185.) This is significantly more restrictive than the MJ Agreement in both duration and geography, and it adds a non-compete requirement.

The Arizona-wide restriction is not per se unreasonable given GG's national focus and Johnson's high-level role. *Amex*, 724 P.2d at 604. But restrictions which govern employee behavior for three years post-employment are uncommon, even for executives who agree as explicit consideration for an added benefit (like stock options). *Id*. Courts uphold non-compete restrictions lasting a year or "even longer" when those restrictions deal with a complex servicing relationship. *Id*. But cases have rarely upheld three-year restrictions, and to do so the company would need to show the full three years is necessary to protect its business interest. *See Bryceland v. Northey*, 772 P.2d 36, 40 (Ariz. Ct. App. 1989) (two-year restriction unreasonable because company needed far less time to find replacement). GG's servicing relationship appears complex, as evidenced by the importance of customer relationships and brand goodwill (*see* Doc. 235-2 at 183) and the fact that Turbo chose to hire trained, formerly-GG employees to manage customer relationships rather than hiring new ones (Doc. 115 at 14-15). But GG does not provide evidence the full three years was necessary. GG argues it would take three years to suitably replace Johnson and his trust with customers (Doc. 244 at 23), but it does not argue the role requires three years of training. A suitable replacement is not the same as a perfect one. *See id*.; *Amex*, 724 P.2d at 605. GG also suggests three years is reasonable because it

took over three years to launch QM (Doc. 252 at 6), but it is unclear why QM's development timeline should be tied to Johnson's ability to work for competing companies.

Three years cannot be blue-penciled to one. *Farber*, 982 P.2d at 1286 (courts cannot rewrite provisions using blue-pencil rule); *see Berkadia Real Est. Advisors*, 2024 WL 4125533, at *10 (holding it beyond blue-pencil rule to replace "18 to 24 months" with "12 months"). The non-compete and non-solicit restrictions in the MJ Option Agreement are overbroad and unenforceable. As such, GG's motion for summary judgment on Claim 14 is denied. Turbo's motion regarding the MJ Option Agreement is granted; Claim 16 is dismissed. *See Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 763 (9th Cir. 2017) ("Absent a contract, there can be no implied covenant of good faith and fair dealing.").

### D. Tortious Interference with Contracts/Business Expectancies (Claim 25)

GG alleges the remaining defendants tortiously interfered with GG's contracts by encouraging employees to breach them and successfully soliciting insurance customers, which also affected its business expectancies. (Doc. 245 at 4.) All defendants except Johnson move for summary judgment on this claim. (Docs. 231 at 18-19; 235 at 13-23.)

The elements of tortious interference with a contract and with a business expectancy are the same, so the claims may be analyzed together. *Dube v. Likins*, 167 P.3d 93, 99–100 (Ariz. Ct. App. 2007). A plaintiff must allege (1) a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy; (3) intentional interference that induced or caused breach or termination of the relationship or expectancy; (4) damage as a result; and (5) improper conduct. *Id.*; *see Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 164 P.3d 691, 693-94 (Ariz. Ct. App. 2007) (discussing seven-factor analysis to determine impropriety of conduct). Material factual disputes prevent summary judgement on this claim, too.

The court has already rejected the first argued basis for summary judgment on this claim, i.e., that the restrictive covenants are unenforceable. (Docs. 231 at 18-19; 235 at 13-16, 19-22.) As previously discussed, the MJ Agreement is enforceable.

The parties next contest whether Kresevic knew about those contracts. For this claim to survive summary judgment, there must be enough evidence for a reasonable jury to conclude Kresevic knew more than that these contracts and business expectancies generally existed: he must have known their terms well enough to expect his behavior would interfere with them. *BAE Sys. Mobility & Prot. Sys., Inc. V. ArmorWorks Enters., LLC*, No. CV-08-1697-PHX-JAT, 2011 WL 1192987, at *6 (D. Ariz. Mar. 28, 2011). Kresevic indisputably knew about Johnson's agreements with GG and the confidentiality and post-employment restrictions on his behavior. (Doc. 231 at 18; *see* Doc. 245 at 4-5.) Though some conversations between Johnson and Kresevic happened after key events, a jury could find they indicate prior knowledge. *See Aether, LLC v. Unt Holdings OU*, No. CV 21-313-MEMF(EX), 2023 WL 11926422, at *1 (C.D. Cal. Mar. 30, 2023) (statements made after events "can be relevant to prove the nature of an earlier existing state of affairs"). And a reasonable jury could find Kresevic inferred similar contracts existed between GG and the other employees, particularly given the pattern of their departures from GG, brief work for other employees, and coordinated arrival at Turbo.

There is a fact dispute regarding intentional interference, as well. This element requires the plaintiff show the defendant was at least a significant cause of the damage. *Rose v. Dignity Health*, No. CV-21-00775-PHX-JAT, 2023 WL 6147534, at *13 (D. Ariz. Sept. 20, 2023) (interferer's conduct must be "'significant cause' [], or even a 'but-for' cause," of damage). GG has enough evidence to permit a reasonable jury to find Kresevic played at least a significant role in the alleged breaches of contract, including "ask[ing] Johnson about taking those GG employees to Turbo"; personally soliciting GG employee David Roth-Gonzalez; suggesting ways Johnson could use information he learned at GG for Turbo's benefit; and telling investors Johnson had successfully brought multiple GG insurance carriers to Turbo (Doc. 245 at 7, 9 (compiling evidence)). *See Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 211 (Ariz. 1986) (conduct was intentional where interferer intended result or knew it was "substantially certain to be produced" by his conduct). The way Kresevic navigated Johnson and the other employees' exits from GG makes it

factually possible he was a significant or but-for cause of the alleged breaches of contract and GG's business expectancies.

There is also disputed evidence a jury could credit to find Kresevic's improper motive. *See Ulan v. Vend-A-Coin, Inc.*, 558 P.2d 741, 745 (Ariz. 1976) (absent contract and improper motive or means, disturbance to business relationships as a result of competition is not actionable). He may have held a personal grudge against Garzella (Doc. 245-3 at 24 (Kresevic discusses wanting to "dick punch" Garzella, whom he describes as a "pussy")) and was explicitly covert in using GG's technology and materials (Doc. 245-3 at 23 (instructing Johnson to use GG accomplishments to attract investors, but "not in writing"). *See Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 33 (Ariz. 2002) (conduct improper where court could infer knowledge of false statements and covert behavior).

Finally, in tortious interference cases, damages require "'a reasonably certain factual basis for computation of probable losses.'" *S. Union Co. v. Sw. Gas Corp.*, 180 F. Supp. 2d 1021, 1048 (D. Ariz. 2002) (citing *Rancho Pescado, Inc. v. Northwestern Mut. Life Ins. Co.*, 680 P.2d 1235, 1245 (Ariz. Ct. App. 1984)). But "once the fact of damages has been shown, the amount of damages may be established with proof of a lesser degree of certainty than required to establish the fact of damages." *Rancho Pescado*, 680 P.2d at 1245. GG's expert report lays out damages attributable to Turbo and Johnson from soliciting the employees, which provides a reasonably certain basis for computing damages. (Doc. 245 at 8.) Anything beyond that raises a question of fact best reserved for the jury. *Cf. S. Union Co.*, 180 F. Supp. 2d at 1051 (although fact of damages was too speculative, claim could proceed because of other disputes of material fact).

The motions for summary judgment as to this claim are denied.

**E. Aiding and Abetting Breaches of Duty and Contracts (Claims 8, 10, 13, 16)**

GG alleges Turbo and Kresevic aided and abetted Johnson's breach of fiduciary duties to GG (Doc. 115 at 46, 48) and alleges Turbo aided and abetted Johnson's breaches

of contract and associated covenants of good faith and fair dealing (Doc. 115 at 52, 56). Kresevic moves for summary judgment on the claim he aided Johnson's breach of fiduciary duties. (Doc. 231 at 14.) Turbo also sought summary judgment on the two aiding-and-abetting claims premised on the MJ Agreement and the MJ Option Agreement, but its motion was based solely on the restrictive covenants already addressed above.

The parties do not seriously contest that as alleged, there is a factual dispute as to whether Johnson's actions breached his fiduciary duty toward GG. And regardless of whether a specific Arizona statute applies (*contra* Doc. 256 at 13), Johnson's alleged work for a competitor while employed at GG—which Kresevic knew—would likely constitute a breach of Johnson's duty of loyalty. *See Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008).

To state a claim of aiding and abetting tortious conduct, a plaintiff must allege the primary tortfeasor committed a tort that injured the plaintiff, the defendant must know that the primary tortfeasor's conduct constituted a breach of duty, and the defendant must substantially assist or encourage the primary tortfeasor in achieving the breach. *See id.* at 23. These elements are very similar to those for tortious interference, a claim subject to factual disputes. Although Kresevic argues there is no evidence to suggest his wrongdoing (Doc. 231 at 15-18), the facts creating disputes about Kresevic's knowledge and assistance of Johnson's behavior apply here, too. Because a reasonable jury could plausibly find for GG, Kresevic's motion for summary judgment is denied as to the aiding-and-abetting claims.

### F.  Unjust Enrichment (Claim 30)

GG alleges in the alternative that all defendants were unjustly enriched by their use of GG's confidential information. (Doc. 115 at 77.) Kresevic moves for summary judgment on this claim. (Doc. 231 at 22-23.)

GG alleges Kresevic acted as Turbo's agent in the context of unjust enrichment and in that capacity may be personally liable for torts he authorized or participated in. (Docs. 115 at 12; 245 at 10 (citing *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989)

- 23 -

(holding sole officers and shareholders of company personally liable for company's actions)).) It is true that in Arizona, "a director or officer of a corporation may be held personally liable for the torts of a corporate entity in which the director or officer participates," even if he acts as an agent of the company. *B2B CFO Partners, LLC v. Kaufman*, 856 F. Supp. 2d 1084, 1093 (D. Ariz. 2012); *see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016). But unjust enrichment is a quasi-contract claim, not a tort, so this principle does not apply. *In re Legacy Cares, Inc.*, No. 2:23-BK-02832-DPC, 2024 WL 3493249, at *6 (Bankr. D. Ariz. July 19, 2024). Accordingly, Kresevic's motion for summary judgment is granted on this claim.

### G. Unfair Competition (Claim 6)

Using a similar theory of liability, GG alleges Kresevic is liable for unfair competition (Doc. 115 at 42), a common-law doctrine which encompasses tort theories including information misappropriation. *Paul Johnson Drywall Inc. v. Sterling Grp. LP*, No. CV-21-01408-PHX-DWL, 2025 WL 553001, at *47 (D. Ariz. Feb. 19, 2025).

Such a claim is preempted by the AUTSA where it touches on information the factfinder finds qualifies as a trade secret. *Orca Commc'ns*, 337 P.3d at 550. As previously discussed, an analysis regarding preemption therefore relies on the trade secrets determination, which in this case cannot be made at summary judgment. *See id*.

Arizona requires a plaintiff alleging unfair competition to show it was "engaged in competitive business" with the defendant or the defendant's actions were "likely to produce public confusion." *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992). Kresevic argues GG has not shown he competed with it in his personal capacity. (Doc. 231 at 14.) In response, GG offers only a conclusory statement that Kresevic was individually a competitor and he acted as Turbo's agent. (Doc. 245 at 10.) GG has only now raised an agency theory of liability and may not go forward with that theory at trial. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-92 (9th Cir. 2000) ("adding a new theory of liability at the summary judgment stage would prejudice the defendant"). Nonetheless, Kresevic may be liable for Turbo's actions as a director who

- 24 -

allegedly personally participated in the torts of a corporate entity. *B2B CFO Partners*, 856 F. Supp. 2d at 1093. To be liable, a director "must participate or have knowledge amounting to acquiescence or be guilty of negligence in the management and supervision of the corporate affairs contributing to the injury." *S. Union Co.*, 180 F. Supp. 2d at 1058. The evidence discussed above related to Kresevic's active and intentional participation in a conspiracy to benefit from GG's customers, solicit GG's employees, and use GG's confidential information in breach of certain employment contracts supplies material facts supporting Kresevic's individual liability for tortious interference. *See id*. Accordingly, his motion for summary judgment on this claim is denied.

### H. Civil Conspiracy (Claim 29)

Kresevic moves for summary judgment on GG's civil conspiracy claim, arguing there is no dispute of material fact as to whether his conduct was tortious. (Docs. 115 at 74-77; 231 at 23). Civil conspiracy liability requires plaintiffs show by clear and convincing evidence that "the defendant and at least one other person agreed to accomplish an unlawful purpose or a lawful purpose by unlawful means, and accomplish[ed] the underlying tort, which in turn caused damages." *Dawson v. Withycombe*, 163 P.3d 1034, 1053 (Ariz. Ct. App. 2007). The conspiracy may be implied rather than express, but the plaintiff must show the defendant's conduct was more than merely suspicious. *Wells Fargo*, 38 P.3d at 37. Assisting a tortfeasor may support an inference of conspiratorial agreement, but it not necessarily enough: the evidence must show actual agreement rather than mere knowledge that an action "might substantially aid the tortfeasor to commit a tort." *Dawson*, 163 P.3d at 1053.

GG lists as underlying torts copyright infringement, misappropriation of trade secrets, unfair competition, aiding and abetting breaches of officer and employee fiduciary duties, tortious interference with contract and business expectancies, conversion, and unjust enrichment. (Doc. 245 at 11.) Some of these ultimately may not qualify as underlying torts; for instance, misappropriation of trade secrets could be preempted by the AUTSA, *Orca Commc'ns*, 337 P.3d at 550, and unjust enrichment is not a tort, *In re Legacy*

*Cares*, 2024 WL 3493249, at \*6. But as discussed above, GG has presented facts that create a material dispute regarding Kresevic's involvement in copyright infringement and tortious interference and his personal liability for Turbo's torts. (Doc. 245 at 11.) Kresevic's motion for summary judgment is denied as to this claim.

## I. Counterclaims

In January 2025, defendants Johnson and Turbo asserted counterclaims against GG. (Doc. 120 at 62-70.) The counterclaims are based on the buyout agreement Johnson and GG attempted to negotiate in 2022. Johnson and Turbo allege GG breached the buyout agreement and its implied covenant of good faith and fair dealing by refusing to sign the agreement or abide by its terms. (Doc. 120 at 62-70.) GG disagrees that an agreement was made and moves for summary judgment on the counterclaims. (Doc. 225 at 23.)

This court has previously agreed with GG, holding the buyout agreement was not a valid contract and denying a motion by Johnson to enforce it. (Doc. 191 at 7.) That ruling was based on a variety of objective circumstances showing neither party intended to be bound, including redlines in the draft, negotiations that continued long afterwards, GG's refusal to sign, and Johnson's failure to seek the payment he would have been due under the agreement until this litigation (two-and-a-half years later). (Doc. 191 at 5-8.) Defendants now argue additional material facts have surfaced which evince GG's intent to be bound. (Doc. 241 at 22.) These facts do not alter the court's reasoning, which was based on far more than GG's intent.

First, Garzella confirmed in GG's 30(b)(6) deposition that he authorized his counsel to send the relevant June 17, 2022 version of the agreement. (Doc. 241 at 23.) But there is no question Garzella's counsel had authority to send that and other versions of the agreement: the issue is whether the June 17 draft was binding. Second, defendants offer testimony from Richard Nine, a former GG employee who now works at Turbo. (Doc. 241 at 23.) Nine testified that at some point between May and July, Garzella said he and Johnson had agreed to a settlement with terms that matched multiple versions of the agreement; Garzella said he had signed the document and was waiting on Johnson's

signature. (Docs. 241-15 at 4-7; 241 at 23.) This evidence is insufficient to raise a dispute of material fact as to whether the buyout agreement constituted a contract, considering the version of the agreement at issue did *not* contain Garzella's signature (Doc. 120-2 at 5) and Nine may be referring to other versions passed between the parties from May to July 2022 (Doc. 241 at 21). *United Ass'n Loc. 38 Pension Tr. Fund v. Aetna Cas. & Sur. Co.*, 790 F.2d 1428, 1430 (9th Cir. 1986) ("An issue of fact is not material unless it has legal probative force as to a controlling issue.").

Based on the evidence before it at the time, this court previously found the buyout agreement was not a valid contract. The new evidence presented here does not alter that reasoning. As a consequence, a reasonable jury could not find GG breached the covenant of good faith and fair dealing implied in the buyout agreement because that agreement was not a binding contract. *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986) (implied covenant arises out of contractual relationship and requires party not impair the other's rights to "receive the benefits which flow from their agreement"). Summary judgment for GG is therefore granted on both counterclaims.

## IV.    Motion for Leave to Serve Document Subpoena

GG requests leave to serve a document subpoena on non-party MyBizNiche for documents relevant to the services that company provided to Turbo. (Doc. 251.) GG alleges it heard testimony only after the close of discovery that Turbo had requested marketing services specifically targeting GG's business. (Doc. 251 at 2.) GG now asks for documents that may be relevant to support that testimony solely for use at trial, and alleges the delay is in part due to Turbo's behavior. (Doc. 251 at 2, 4.)

Courts may modify scheduling orders only given "good cause." Fed. R. Civ. P. 16(b)(4). The Ninth Circuit at times uses the following test to determine whether discovery should be reopened under this standard: (1) "whether trial is imminent"; (2) "whether the request is opposed"; (3) "whether the non-moving party would be prejudiced"; (4) "whether the moving party was diligent in obtaining discovery"; (5) "the foreseeability of the need for additional discovery"; and (6) "the likelihood that the discovery will lead to

relevant evidence." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066 (9th Cir. 2017). But not all factors are weighed equally; the standard "primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992); *see Branch Banking*, 871 F.3d at 764 (inquiry should end if moving party was not diligent).

As for the first factor, though trial was not set at the time the parties briefed this motion, it is now scheduled to begin June 23. (Doc. 267.) This is soon, but it is not currently the eve of trial. Second, Turbo opposes this request only because fact discovery is closed. (Doc. 261 at 8.) Third, there does not appear to be significant risk of prejudice to Turbo given the requested discovery is very narrow, burdens only a non-party, will only be used for trial, and relates to content Turbo already has reason to know (Doc. 251 at 7). *See Warren v. Winco Foods, LLC*, No. 1:22-CV-00594-SAB, 2023 WL 5336816, at *13 (E.D. Cal. Aug. 18, 2023) (finding "slight" prejudice where movants requested ten depositions). And Turbo offers no facts supporting its concern this subpoena may require additional discovery. (Doc. 261 at 9.) As to the fourth and fifth factors, which weigh most heavily, it appears GG acted promptly to seek discovery on an issue which became apparent during a post-discovery-period deposition. (Doc. 251 at 8.) Though GG had previously designated MyBizNiche as a knowledgeable party and suspected Turbo had run a competitor campaign against it (Doc. 261 at 12-13), those facts did not put GG on notice that MyBizNiche may have been responsible for the campaign. GG also alleges facts suggesting Turbo was evasive about this issue during discovery, further supporting this was not a foreseeable issue (Doc. 266 at 10 (Turbo employees deny GG and Turbo are competitors)). *Cf. Johnson*, 975 F.2d at 609-10 (moving party was not diligent where it failed to heed clear signals about information despite other party's candidness). Finally, evidence regarding whether Turbo specifically asked MyBizNiche to run a competitor campaign is relevant because the evidence already in the record is based only on the testimony of an employee whose credibility Turbo disputes. (Doc. 241 at 6-7.)

Ultimately, the request is limited and reasonable; there is good cause to grant it.

## V. Conclusion

For the foregoing reasons, the parties' motions for summary judgment are granted in part and denied in part. GG's motion for leave to serve a document subpoena is granted.

Accordingly,

**IT IS ORDERED** GG's Motion for Partial Summary Judgment (Doc. 225) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** Turbo's Motion for Summary Judgment (Doc. 235) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** Kresevic's Motion for Summary Judgment (Doc. 231) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** the Motion to Serve Subpoena (Doc. 251) is **GRANTED**. GG shall serve the subpoena within five days of this order.

**IT IS FURTHER ORDERED** that the trial is set to begin on **June 23, 2026**, and the anticipated end date is no later than **July 17, 2026**. Trial will be held Tuesday through Friday of those weeks, excluding federal holidays. Because the court expects the trial will not last the entirety of that period, no later than **April 7, 2026**, the parties shall file a joint statement identifying the expected length of trial.

Dated this 31st day of March, 2026.

Honorable Krissa M. Lanham
United States District Judge